[762 NYS2d 593]

In the Matter of CDL WEST 45TH STREET LLC, Appellant, v CITY OF NEW YORK DEPARTMENT OF FINANCE et al., Respondents.

First Department, June 17, 2003

## APPEARANCES OF COUNSEL

*Charles G. Moerdler* of counsel (*Donald Liebman, David Goldstein* and *Stanley Parness* on the brief; *Stroock & Stroock & Lavan LLP,* attorneys), for appellant.

*Anilkumar R. Avutu* of counsel (*Rita D. Dumain* and *Carl A. Laske* on the brief; *Michael A. Cardozo, Corporation Counsel,* New York City, attorney), for respondents.

## OPINION OF THE COURT

SULLIVAN, J.

This is an appeal from the dismissal of a CPLR article 78 challenge to the denial of petitioner's application for real property tax benefits under the Industrial and Commercial Incentive Program (ICIP), a real property tax incentive program created by the New York State Legislature and codified as Real Property Tax Law § 489-aaaa *et seq.* The purpose of this program is to encourage the renovation and expansion of existing commercial property in the hope of realizing increased job opportunities and economic growth.

Petitioner owns and operates the Millennium Broadway Hotel, located at 133-145 West 44th Street and described on the tax maps of the City of New York as Manhattan block 997, lots 10 and 17 (the Hotel). Respondent New York City Department of Finance is the administrative agency authorized, inter alia, to administer ICIP and determine eligibility thereunder; respondent Cerullo was, at all times relevant, its Commissioner.

Until 1998, the Hotel consisted of two physically integrated structures occupying a single tax lot (lot 10): a 46-story structure containing 627 guest rooms, a restaurant and 33 conference or banquet rooms (the Initial Wing), and the Hudson Theater, a three-story and basement structure designated as a New York City landmark, which serves as a conference center for the Hotel (referred to collectively as the Existing Hotel Facility). In 1996, petitioner commenced a renovation and expansion (the Renovation/Expansion Project) of the Existing Hotel Facility and in June 1997 acquired tax lot 17, which was contiguous to the Existing Hotel Facility and adjacent to the Hudson Theater. At the time, lot 17 was improved with a three-story office building (Newspaper Guild) of 21,850 square feet. After the acquisition of lot 17, the Renovation/Expansion Project was enlarged to include demolition of the old three-story structure and the construction of a new wing (New Wing) expanding the Existing Hotel Facility.

The Renovation/Expansion Project contemplated numerous improvements to the Existing Hotel Facility, including refurbishment of the 627 guest rooms, consolidation of the Hotel's previously scattered office space, relocation of the Hotel's health club and the expansion of its facilities, upgrade of the Hotel's telephone system and an increase in accessibility for the physically handicapped. The Project also called for improvements and renovations to the Hudson Theater, including modernization of its electrical equipment and restoration of its exterior. In addition, the project provided for the expansion of the Existing Hotel Facility by the construction of the New Wing, a 22-story structure, which was to be fully integrated into the Existing Hotel Facility in place of the three-story office building that was to be demolished and upon whose foundation the New Wing construction was to take place.

Construction of the New Wing began in July 1997 with the demolition of the three-story building. In November of 1998, the New Wing, which contains, among other things, 124 guest rooms and a lounge for Hotel guests, and is connected to and used in connection with the Existing Hotel Facility, was opened to guests. The aggregate gross floor area of the Existing Hotel Facility was approximately 549,000 square feet; the gross floor area of the New Wing is approximately 74,200 feet or 14% of the combined floor area of the Existing Hotel Facility. Prior to the construction of the New Wing, the Initial Wing and Hudson Theater were, and still are, physically interconnected at all three levels that they share in common. All three buildings are connected via passageways on the first, second and basement floors.

In addition, the three structures have been physically and functionally integrated into a single Hotel complex in a number of other ways. The New Wing, which does not have a kitchen, depends on the Initial Wing's facilities for room and mini-bar service. All the restaurants for Hotel guests, as well as employee dining facilities, are located in the Initial Wing. There is no cooling tower, or even the space to construct one, in the New Wing; it depends on the Initial Wing for its supply of chilled water to run the air conditioning. The New Wing also lacks laundry facilities and depends on the Initial Wing for such services. Nor does it have garbage removal or recycling facilities; it depends on the Initial Wing for those functions as well, including garbage storage space as required by the Department of Buildings. The securing of a certificate of occupancy for the New Wing required an easement from the

Initial Wing to store its trash pending removal. The Initial Wing also supplies housekeeping and concierge services to the New Wing. The Hotel's administrative staff, which provides services to the entire Hotel complex, is located in the Initial Wing, which also houses the equipment for outside telephone and television services for the New Wing and the single computer system to which the entire Hotel complex is connected. Deliveries to the New Wing come through the Hotel complex's only loading dock, located in the Initial Wing. Security for the Hotel complex, including the New Wing, which is integrated, is operated from the basement of the Hudson Theater; fire controls for the complex, including the New Wing, are located in the Hudson Theater. The New Wing's design has been integrated into the Art Deco look of the Initial Wing. So fully integrated into the remainder of the Hotel complex is the New Wing that it could not function, legally, physically or economically, on its own as a hotel without the services provided by the Initial Wing and the Hudson Theater. The three structures comprising the Millennium Broadway Hotel are operated and managed as a single unit.

Of the approximate $36 million total cost of the Renovation/Expansion Project, about $30 million was attributable to the New Wing; the balance was expended on renovations to the Existing Hotel Facility. It is estimated that the project will generate in excess of $26 million in local economic activity and $1,800,000 in nonproperty taxes for the City annually. In addition to the several hundred construction jobs, it has created 67 permanent positions with a payroll of more than $2,300,000 for City residents.

On or about August 12, 1997, petitioner filed an application under ICIP for partial exemption from real property taxes for the portion of the Renovation/Expansion Project relating to the New Wing. Petitioner demonstrated that the Existing Hotel Facility was located in an area in Manhattan eligible for ICIP benefits for "renovation construction work" under Real Property Tax Law § 489-aaaa *et seq.* and that the construction of the New Wing constituted "renovation construction work" as defined by Administrative Code of the City of New York § 11-256 (w), and claimed that the New Wing was physically and functionally integrated into the Existing Hotel Facility and did not increase the bulk or height of the Existing Hotel Facility by more than 30%.

Respondents denied the application, concluding that the New Wing must be classified as the renovation of the three-story

building on lot 17, which exceeded the bulk and height of the existing building by more than 30% and would therefore be ineligible for the exemption, rather than as "integrally related to the existing hotel and theater," in which case the New Wing would qualify for the exemption since its height and bulk would not exceed 30% of the existing two buildings. Respondents stated that "[t]he requirement of a separate certificate of occupancy for the new wing mandates this conclusion." On administrative appeal, respondents issued a final determination affirming the denial of ICIP benefits solely on the ground that the New Wing was a "separate building with its own certificate of occupancy."

This proceeding was thereafter commenced challenging the final determination. Supreme Court denied the petition. Adopting the conclusion that the New Wing was a renovation of the demolished three-story office building rather than a renovation of the Existing Hotel Facility, the court held that it was not unreasonable "to view the hotel—a recent 46-story tower, a low-rise landmark theater, and a new 20-story addition—as three separate entities for purposes of the ICIP, such that the renovation or construction of one does not constitute the renovation of the whole." This appeal followed. We reverse.

To encourage the development, expansion and preservation of commercial and industrial real estate in the City of New York, the New York State Legislature in 1984 amended Real Property Tax Law article 4 to authorize the City to enact a local law providing a real property tax exemption system, known as ICIP (Real Property Tax Law § 489-bbbb, added by L 1984, ch 966, § 2). The enabling legislation superseded an incentive system known as the Industrial and Commercial Incentive Board (ICIB). Whereas the benefit under ICIB was discretionary, it is a matter of right under ICIP. The City was of one mind with the Legislature in changing to an as-of-right tax incentive program. In its "Analysis of the Proposed Reform of the ICIB Program," the City Office for Economic Development stated that an as-of-right system would be fairer, clearcut, predictable, and "remove[ ] artificial barriers to program participation in eligible areas" (Summary at i, iii, Bill Jacket, L 1984, ch 966). The New York City Council implemented the legislative mandate of ICIP by enacting part 4 of Administrative Code, title 11, chapter 2, subchapter 2. Administrative Code § 11-263 authorized respondents to promulgate ICIP regulations, leading to the 1986 promulgation of chapter 14 of title 19 of the Rules of the City of New York (RCNY).

In 1992, the State Legislature amended ICIP (L 1992, ch 781) and created a simplified two-pronged test for ICIP eligibility in a renovation exemption area by defining "renovation construction work" as:

> "[T]he modernization, rehabilitation, *expansion* or improvement of an *existing building or structure, or portion thereof,* for use as commercial property in a renovation exemption area where such modernization, rehabilitation, expansion or improvement is *physically and functionally integrated with the existing building or structure, or portion thereof, does not increase the bulk of the existing building or structure by more than thirty per centum* and does not increase the height of the existing building or structure by more than thirty per centum" (RPTL 489-aaaa [23] [emphasis supplied]).

The expansion and renovation of petitioner's Existing Hotel Facility brought about by the construction of the New Wing clearly satisfies the first prong of the Real Property Tax Law's ICIP eligibility test. The New Wing is physically, functionally and economically integrated with the Existing Hotel Facility in myriad ways, as noted, including reliance on the Existing Hotel Facility for air conditioning, cooling tower, telephone and television service, Hotel kitchen, restaurants, employee dining, laundry and housekeeping facilities, computer system, concierge, administrative staff, security, fire controls, loading dock and garbage disposal. The New Wing has no existence separate and independent of the Existing Hotel Facility; nor, given the way it has been set up, could it exist as a separate entity. The Initial Wing, New Wing and Hudson Theater are interconnected at all three levels in common. Indeed, respondents, who inspected the premises, do not dispute these characteristics of physical integration.

Furthermore, respondents admit that the construction of the New Wing "must be classified for ICIP purposes as a renovation" and concede that should the New Wing be deemed a renovation/expansion of the Existing Hotel Facility it would not exceed the 30% statutory ceiling, thus qualifying for the ICIP exemption. While not directly challenging the functional and economic integration of the New Wing with the Existing Hotel Facility, respondents, despite the evidence to the contrary, have determined that the New Wing is a separate building not physically integrated with the Existing Hotel Facility. In so ruling, respondents have ignored the evidence of physical

and functional integration and relied solely on the conclusion that the New Wing is "a separate building with its own certificate of occupancy." In contravention of the legislative intent, respondents have disregarded the plain meaning of the ICIP statute and regulations, distorting the criteria for ICIP eligibility.

Nowhere in the Real Property Tax Law is the term "physically integrated" defined. Had the Legislature intended to quantify or qualify the term it would have done so through an appropriately worded definition. Furthermore, no limitations of the term are expressed in either the Administrative Code or the ICIP regulations. As is evident, respondents cannot support their denial of petitioner's claim for ICIP benefits with any administrative precedent. In response to a discovery order requiring production of "other [ICIP] applications involving multiple certificates of occupancy under analogous circumstances where eligibility has been determined, whether finally or preliminarily, for the period five years prior to petitioner's denial of benefits," respondents asserted that after an 8,000-file search, they could not find one that "involved circumstances truly analogous to the subject application."

Despite this lack of experience with a similar case, respondents, by administrative fiat and without observing the legal niceties for promulgating new agency regulations, have transformed the two-part statutory test requiring merely physical and functional integration for ICIP eligibility to one in which physical integration becomes a matter of degree, without any basis of measurement. In rejecting petitioner's application, they have determined, conclusorily, that the physical integration of the New Wing and Existing Hotel Facility is "hardly sufficient."

In addition, respondents misstate the law. They argue that, pursuant to 19 RCNY 14-05 (j) (5), a building is a separate and complete structure if it can be demolished without causing substantial damage to any other structure and point to the fact that each of the three structures comprising the Hotel complex can be demolished without causing substantial damage to any of the other two structures. In making this argument, respondents rely only on subparagraph (ii) of the rule, and ignore the requirement set forth in subparagraph (i), i.e., that the property must be "intended and suitable for use independent of any other article or structure." Clearly, neither the New Wing, nor, indeed, any of the other two structures that make up the complex, fits that criterion.

Although the interpretation of regulations made by the agency responsible for their administration is generally entitled to deference, "an agency is not thereby freed of the obligation to read those regulations reasonably and rationally" (*Matter of Mutual Redevelopment Houses v New York City Water Bd.*, 279 AD2d 300, 301 [2001]). In holding that an agency's interpretation of a rule's scope was "unreasonable since it was irreconcilable with the plain meaning of the governing regulation," the Court stated: "Such restriction of the regulation's evidently intended protective scope required and eventually was accomplished through promulgation of a new, prospectively applicable regulation; it was not properly achieved by means of a retroactively applicable agency gloss" (*id.*). In the instant matter, respondents went beyond an agency gloss; they usurped the legislative function and fashioned a standard where none previously existed.

The fact that the New Wing was issued a separate certificate of occupancy, the sole factor relied upon in the denial of ICIP benefits, should not have even been a significant consideration. Since the total area of the proposed construction would have exceeded the maximum permissible floor area ratio for the zoning lot on which the three structures were situated, the lot on which the New Wing is situated was established as a separate zoning lot, for which a separate certificate of occupancy was required. Thus, the issues of physical and functional integration have nothing to do with the fact that the New Wing had a separate certificate of occupancy. In addition, an otherwise unavailable development potential was made possible by the creation of separate zoning lots, with the consequence of separate certificates of occupancy.

It should be noted that each of the structures comprising the Existing Hotel Facility, i.e., the Millennium Broadway Hotel and the Hudson Theater, has a separate certificate of occupancy although respondents treat them as a single entity for tax assessment purposes. Before petitioner acquired the Existing Hotel Facility, respondents merged the two separate tax lots upon which the original Hotel and the Hudson Theater were situated into a single tax lot.

Moreover, notwithstanding that each of these two buildings has a separate certificate of occupancy, respondents treat both the Millennium Broadway Hotel and the Hudson Theater as a single entity for ICIP purposes. As a matter of procedure,

respondents annually issue ICIP recipients a certificate of continuing use (CCU), which the taxpayer must complete and return to maintain the exemption. When the Millennium Broadway Hotel was originally constructed in the 1980s, it received an ICIP benefit. As the record shows, in 1997, respondents issued and accepted for filing only one CCU for both the Millennium Broadway Hotel and the Hudson Theater. Thus, contrary to respondents' determination, the issuance of separate certificates of occupancy is neither dispositive nor even persuasive on the issue of petitioner's right to an ICIP exemption for the New Hotel Wing.

That the Existing Hotel Facility received an ICIP benefit at the time of its original construction in the 1980s has no bearing on the New Wing's eligibility for ICIP benefits. The ICIP law would even permit a second exemption on the original portion of the Hotel Facility, if that were being sought. Thus, the issue is not whether the expanded Hotel Facility has more than one certificate of occupancy or whether petitioner performed an alteration of the old Newspaper Guild building. What petitioner achieved here was an expansion, on a single project site, of the Existing Hotel Facility, by the physical and functional integration of a structure on a contiguous lot. As such, it fits within the definition of "Renovation construction work" contained in Real Property Tax Law § 489-aaaa (23). As conceded, the expansion did not increase the bulk of the Original Hotel Facility or increase its height by more than 30%. What it did increase is the number of available hotel rooms and housing industry jobs in the City of New York, surely one of the purposes of the statutory exemption, to which we should look in determining its scope (*Matter of 5-7 Park Ave. Corp. v Tax Commn. of City of N.Y.*, 9 AD2d 106, 109 [1959]).

Thus, we conclude that respondents' denial of petitioner's application for an ICIP exemption is unsupportable and was arbitrary and capricious.

Accordingly, the judgment of the Supreme Court, New York County (Carol Huff, J.), entered December 4, 2001, denying the petition to annul respondents' determination denying petitioner's application for real property tax benefits under the Industrial and Commercial Incentive Program and dismissing the proceeding, should be reversed, on the law, without costs or disbursements, and the petition granted to the extent of annulling said determination and directing respondents to grant the application.

MAZZARELLI, J.P., LERNER, FRIEDMAN and GONZALEZ, JJ., concur.

Judgment, Supreme Court, New York County, entered December 4, 2001, reversed, on the law, without costs or disbursements, and the petition granted to the extent of annulling the respondents' determination and directing respondents to grant petitioner's application.